**UNITED STATES of America, ex rel. Charles SILAGY, Petitioner,**

v.

**Howard PETERS, III, and Neil Hartigan, Respondents.**

No. 88–2390.

United States District Court, C.D. Illinois, Danville Division.

April 29, 1989.

Timothy Gabrielsen and Patricia G. Mysza, Springfield, Ill., for petitioner.

Jack Donatelli and Michael Singer, Asst. Attys. Gen., Chicago, Ill., for respondents.

## FINAL ORDER

BAKER, Chief Judge.

This is a habeas corpus proceeding under 28 U.S.C. § 2254. For the reasons stated in this order, the writ will issue directing that the petitioner be resentenced within 120 days.

## BACKGROUND

In the late hours of February 13 and the early hours of February 14, 1980, in Vermilion County, Illinois, two women were brutally beaten and murdered. The petitioner, Charles Silagy, was prosecuted for the murders and convicted. There is no doubt that Silagy killed the two women.

In his voluntary confession to the police, Silagy described what he did to the first victim:

[S]he ... got a little rowdy with me, and I slapped her glasses off of her face, and ... she said somethin' else, and I reached up with my left hand and grabbed her by the throat and started choking her. My truck done a spin-around, and killed itself, and I ... shut it off and started chokin' her ... some more, and kept chokin' her and ... a car come up from the south, and so I acted like we was makin' out, and the car was ... all clear, and I commenced chokin' her with my left hand, and ... then I decided I didn't have enough room, or somethin' ... in the truck ... so I ...

fought with the door for a little bit, and I got it open from the outside, and ... because it will not open from the inside. Had to crank the window down ... and all this time I still got ahold of her throat. And chokin' her. And so I throwed her out on the ground and ... I got outta the truck, and I started a-stompin' on her and jumpin' up and down, and on her head, and ... then I drug her across the road, and she was still breathin', so I ... took out my pocket knife and opened it and pulled her coat and blouse away, and stabbed her approximately five or six times in the chest ... on the ... left ... left-hand side ... and ... then I left her lay there....

Record at C–386.

He also told how he killed the second victim:

[S]o I reached down and ... picked her up and ... started to pick her up, and she turned a table over, and ... I tried to ... take her to the door, and she wouldn't let go of that table, and finally I got her broke loose from the table, and I throwed her over toward the TV, which was back to the east, which the door is to the northwest .. from where we were originally. And ... I, uh ... throwed her down, and her head hit the coffee table, and I went over, and ... kicked her a couple o' times in the head, and then I proceeded to go to a ... drawer, to where the silverware ... the big knives and butcher knives and utensils were kept at ... it was separate from the spoons and forks and things like that. And ... picked me out a knife that I knew would ... not bend, and ... I went back over and snatched her blouse on the left side and yanked it back, and ... stabbed her ... four times continuously in the chest.

Record at C–387.

In the sentencing stage of the case,[1] Silagy elected to proceed *pro se.* Silagy told

1. Ill.Rev.Stat. ch 38, ¶ 9–1(d) says in pertinent part:

Where requested by the State, the court shall conduct a separate sentencing proceeding to determine the existence of factors set

forth in subsection (b) and to consider any aggravating or mitigating factors as indicated in subsection (c). The proceeding shall be conducted:

the jury during the first phase, where it was determined that his offense was one to which the death penalty could apply:

> As you have been instructed, there is two different verdicts. I instruct the jury to apply themselves and think back to your verdict that was rendered yesterday. Take all those items into your mind studying them very closely. Upon examing [sic] those items, do not hinder, do not look at me for sympathy because I don't want it. I ask you to look at it from my standpoint. There is two victims in this crime; they can not ask for sympathy because they are dead. Thank you.

Record at 906.

In the second phase, to determine whether the death penalty should be imposed, Silagy addressed the jury and said:

> I would like to make a statement at this time. Ladies and Gentlemen of the jury, I'm sitting here today. I have voluntarily come up here and sat on this stand to tell you that I did, without any hesitation, stab and kill and stomp Cheryl Block; stomp and stab Anne Budde–Waters. I do not want sympathy from any one of you. Any decision that you would bring back would not be held against you in any form or fashion by anyone in this Courtroom or any of my relations, nor by myself. Also, as has been submitted by the Defense, I mean, excuse me, the prosecution, three documents that have been processed through the legal process. All of those three items I've served some time for. Probation on one. On number two I took a plea bargain; got one to three years in the Illinois State Department of Corrections. I was placed in a maximum security penitentiary; released four months and twenty-eight days later. I was convicted on the second case which I received six to ten years. Went to the Appellate Court; got time cut, which they gave me three years, four months, and ten days. So I

am well aware of the fact what lays in front of me. I have no desire to sit in no man's penitentiary. That's not a cop-out, and that's not a plea. What I am asking the jury is do not feel sympathy, feel empathy. If you can wear these 11's right now, do so.

> My next statement, I will say this: I do want the death penalty; and I will go to any lengths to have it served upon me. I took two lives through my own foolishness, not nobody else's fault. Mine. I paid twice before. I am willing to pay the price now, and no hesitation. I will further state that under provisions within the law which will be instructed by the Judge, he will tell you some of the things that can be and would be given upon me. I assume, Your Honor, that would be correct?

Record at 979–81.

The jury granted Silagy's request and returned verdicts finding unanimously that an aggravating factor existed warranting imposition of the death penalty and that no mitigating factor existed to preclude imposition of that penalty. The trial judge entered judgment on the verdicts and sentenced the petitioner to be executed.

The petitioner sought to overturn the judgment in the Supreme Court of Illinois but his conviction was affirmed. *People v. Silagy*, 101 Ill.2d 147, 77 Ill.Dec. 792, 461 N.E.2d 415 (1984). The petitioner also sought post-conviction relief in the trial court without success, and the post-conviction judgment was affirmed by the Supreme Court of Illinois. *People v. Silagy*, 116 Ill.2d 357, 107 Ill.Dec. 677, 507 N.E.2d 830 (1987).

On November 7, 1988, the petitioner sought habeas corpus in this court to overturn his conviction. Silagy makes five main contentions in support of his petition that center on the following occurrences during the trial proceedings:

---

1. before the jury that determined the defendant's guilt; or. . . .

The consideration of the factors under subsection (b) is the first phase in which the question whether the case is one in which the death penalty may be imposed is decided. The consideration of the factors under subsection (c) is the second phase in which the question shall the death penalty be imposed is decided.

1. The psychiatrists who were appointed by the court to examine Silagy and to assist him with his defense of insanity were not professionally competent. Silagy argues that the physicians, in making their diagnoses, relied on false information given to them by Silagy and reached professionally unacceptable opinions about the petitioner's psychiatric state. As a result, Silagy's rights to due process, to equal protection, and to effective assistance of counsel were abridged.

2. The clerk of the state court jury commission arbitrarily excluded from the jury venire all persons seventy years of age and older. That practice, Silagy argues, deprived him of a jury venire made up of a fair cross section of the community, taking away his Sixth Amendment rights and his Fourteenth Amendment due process rights.

3. Juror misconduct deprived him of his due process rights and his Sixth Amendment right to a jury trial.

4. The trial court committed constitutional error by permitting Silagy to represent himself in the sentencing phase of the trial. The trial judge made no determination, the petitioner asserts, of his mental competency to refuse the assistance of counsel and to elect not to offer any evidence in mitigation in the sentencing proceeding. This resulted in a loss of the petitioner's Fourteenth Amendment due process rights and his Eighth Amendment right to be free from cruel and unusual punishment.

5. The prosecution did not give notice that the psychiatrists' testimony would be relied upon by the State to support a finding of an aggravating circumstance to warrant the death penalty. The petitioner's statements to the psychiatrists were introduced in evidence against him. The petitioner says that these occurrences violated his Fourteenth Amendment rights to due process and his right against self-incrimination under the Fifth Amendment.

The petitioner raises two further claims. The first concerns Illinois' abandonment of electrocution as a means of execution and the second deals with erroneous testimony that the two victims were siblings.

Finally, the petitioner attacks the constitutionality of the Illinois death penalty statute. He argues that it vests unrestricted discretion in the prosecutor to seek the death penalty and lacks basic notice requirements that result in Eighth and Fourteenth Amendment violations.

## RIGHT TO COMPETENT PSYCHIATRIST

■ Prior to trial, in anticipation of raising an insanity defense, the petitioner moved for the appointment of psychiatrists. The trial court ordered Drs. Daniel Pugh and Arthur Traugott of the Carle Clinic in Urbana to examine Silagy to determine whether he "lacked a substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law as a result of mental disorder or mental defect at the time of the offenses charged in this case." (Record at C–53.) The parties agree that the doctors, in formulating their diagnoses, relied to some extent on statements made by Silagy that were later found to be false. The petitioner now argues that because the court-appointed psychiatrists accepted Silagy's uncorroborated and false accounts of his experiences in Viet Nam, they were incompetent. As a result of that incompetency, the petitioner says, there is a great risk that the issue of his sanity was inaccurately resolved.

The petitioner relies upon the Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake*, the Court held that:

[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to chose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a *com-*

*petent* psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Id.* at 83, 105 S.Ct. at 1096 (emphasis added).

The petitioner argues that "because the diagnoses of Drs. Pugh and Traugott are now known to have rested on false facts, and because their methodologies were seriously flawed, especially because they failed to corroborate the statements of exposure to extreme violence that were made by an arguably insane defendant, the assistance they rendered here cannot be said to have been competent within the contemplation of *Ake.*" (Petitioner's Memorandum, p. 31.) The petitioner argues that the standard for determining whether the psychiatrist is competent is the same standard adopted by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864, for determining whether a petitioner was denied effective assistance of counsel. The court rejects this argument.

■ *Ake* requires only that "the indigent defendant have access to a competent psychiatrist...." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. *Ake* does not require that the psychiatrist's evaluation be flawless. The trial judge appointed three board-certified, experienced, practicing psychiatrists to assist the petitioner in preparing his defense. Accordingly, the court finds that the requirements of *Ake* have been met. The court holds that *Ake* merely requires that to be "competent," the psychiatrist appointed by the court must be experienced and board certified. To interpret *Ake* as the petitioner suggests would involve resolving what amounts to a medical malpractice claim in this collateral attack on the state court judgment.

This ground for habeas corpus relief is without merit.

### FAIR CROSS SECTION

■ The parties agree that contrary to Ill.Rev.Stat., ch. 78, ¶ 4 (1979), the civil servant responsible for assembling jury venires in Vermilion County excluded from jury service all persons who were seventy years of age or older. (See Scharlau Affidavit, Exhibit VB.) The petitioner argues that because of this systematic exclusion he was denied his constitutional rights under the Sixth and Fourteenth Amendments to have a jury selected from a fair cross section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed. 2d 690 (1975); *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

In *Taylor,* the Supreme Court held that the Sixth and Fourteenth Amendments require that the jury venire be drawn from a fair cross section of the community. *Id.* at 530, 538, 95 S.Ct. at 697, 701. In *Duren v. Missouri,* the Supreme Court set forth what a defendant must show to establish a *prima facie* violation of the fair cross section requirement. The Court held that:

[T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which jurys are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668.

The petitioner argues that he has established a *prima facie* cross section violation under *Duren.* The only point of contention is whether the group excluded by the jury clerk is a "distinctive" group within the meaning of the *Duren* test. To support that position, the petitioner introduced the testimony of a social scientist during the evidentiary hearing before this court. The court did not find that testimony persuasive.

The court accepts that the petitioner has satisifed parts two and three of the *Duren* test. The court, however, does not agree that the excluded group is a "distinctive" group for *Duren* purposes. People age seventy and above do not, based on age alone, constitute an "identifiable" segment

that plays a major role in the community. *Taylor,* 419 U.S. at 530, 95 S.Ct. at 697. While the elderly have much to offer in terms of life experience and exposure that make their contribution to all aspects of life, including jury service, invaluable, they cannot be classified as an identifiable segment on age alone. They are not a distinct group for *Duren* purposes. What is it that distinguishes people who are seventy years old and older from people who are sixty-nine or sixty or fifty-five for that matter? No evidence was offered to suggest that there is some common thread of shared experience or political, social or religious viewpoint that binds this group together to make it distinct from any other age group. The systematic exclusion of citizens seventy years old and older violated Illinois law but it did not violate the fair cross section requirements of the Constitution. Accordingly, the court holds that the group excluded was not distinctive for *Duren* purposes and as a result the petitioner has failed to raise a proper cross section violation.

Moreover, even if the court found that the group excluded in this case was distinctive for *Duren* purposes, the Supreme Court's recent decision in *Teague v. Lane,* —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), bars this court from applying that finding to overturn the petitioner's conviction.

In *Teague,* the plurality decision written by Justice O'Connor held that "habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review through one of the two exceptions we have articulated." *Id.* 109 S.Ct. at 1078. In *Teague,* the plurality adopted Justice Harlan's exceptions to the general rule of non-retroactivity for cases on collateral review.

First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law—making authority to proscribe." *Mackey v. United States,* 401 U.S. [675] at 692 [91 S.Ct. 1171 at 1180, 28 L.Ed.2d 388 (1971)].

Second, a new rule should be applied retroactively if it requires the observance of "those procedures that ... are 'implicit in the concept of ordered liberty.'" (Citation omitted.)

*Id.* 109 S.Ct. at 1073. Under *Teague* the court must first look at the proposed constitutional rule to determine if it falls within one of Justice Harlan's two exceptions. If it does, then the new constitutional rule of criminal procedure may be recognized on collateral review. Otherwise, the court must refuse to create new constitutional rules of criminal procedure on collateral review.

The petitioner argues that *Teague* does not apply since he is not asking the court to create a new constitutional rule. The petitioner maintains that the rule to be applied in this case is the rule adopted in *Taylor* and *Duren,* and that all he is asking the court to do is apply an old rule and hold that the group of citizens seventy years and older constitutes a "distinctive group." The court does not agree. *Taylor* and *Duren* establish that distinctive groups cannot be excluded from jury venires. The Court has not defined what constitutes a distinctive group. In fact, the Court left it to the states to determine what constitutes a distinctive group. *See Duren* 439 U.S. at 370, 99 S.Ct. at 671; *Taylor,* 419 U.S. at 538, 95 S.Ct. at 701. Accordingly, for this court to decide that the group comprised of persons seventy years and older is a distinctive group for *Duren* purposes, would be to announce a new constitutional rule. Furthermore, the rule would not fall within the two exceptions described by Justice Harlan and adopted by the Supreme Court in *Teague.* This ground for habeas corpus relief, therefore, fails.

## JUROR MISCONDUCT

Silagy claims that his constitutional rights were violated when (1) the trial court failed to replace a sleeping juror, (2) the jury considered off-the-record evidence in the form of media coverage and one juror's personal input, and (3) the jury, in reaching its sentencing verdict, considered off-the-

record, inaccurate information regarding possible punishments Silagy might receive.

(1)

██ Silagy argues that his rights to due process and to a fair trial were violated when the trial court failed to replace a juror who dozed off "a couple of times" during the presentation of testimony.

The Illinois Supreme Court addressed this claim.

> After all of the testimony had been received, the defendant's counsel requested that one of the jurors be removed by the court and replaced by one of the three alternate jurors. Defense counsel stated that she and "other individuals in the Courtroom" had observed the juror periodically dozing during the trial. She claimed that the juror "was about falling or leaning against the juror seated next to him." The trial court stated that it had seen "no evidence as stated by Defense Counsel." When asked why she had not previously called the juror's alleged inattentiveness to the court's and the prosecutor's attention, defense counsel acknowledged that she should have objected earlier.
>
> Despite its expressed belief that the tardiness of the claim raised a question as to the sincerity of the request, the court examined the juror. The juror stated that he may have nodded once or twice for a period of seconds, but could not say that he fell asleep at any time during the course of the trial. He further stated that he did not think he had missed any of the testimony. The defendant's attorney did not question the juror and offered no evidence that the juror had fallen asleep. The court denied the motion to dismiss the juror.
>
> The defendant now argues that he was denied the right to be tried by a jury of 12 competent persons who consider all of the evidence presented. He cites *United States v. Cameron* (3d Cir.1972), 464 F.2d 333, and *United States v. Smith* (5th Cir.1977), 550 F.2d 277, in arguing that the juror should have been replaced. In both of those cases it was said that a juror who cannot remain awake during much of a trial is unable to perform his duty. Here, not only was it not shown that the challenged juror slept regularly during the trial, but the trial court found that the evidence was insufficient to prove that he was asleep at any time. On this issue there was only the defense counsel's allegation and the juror's own testimony that he had not missed any of the testimony. Despite her claim that others had seen the juror sleeping, the defense counsel did not present any testimony to support her claim. It cannot be said that the trial court abused discretion in denying the motion. Too, if the defendant or his attorney did see the juror sleeping, there was a duty to call it to the attention of the court at that time. (*United States v. Carter* (10th Cir.1970), 433 F.2d 874, 876.) The failure to do so resulted in a waiver of the point. *People v. Nachowicz*, (1930), 340 Ill. 480 [172 N.E. 812]; *People v. Shockey* (1966), 66 Ill.App.2d 245 [213 N.E.2d 107].

*People v. Silagy*, 101 Ill.2d 147, 170–71, 77 Ill.Dec. 792, 461 N.E.2d 415 (1984).

The Illinois Supreme Court subsequently refused to readdress the issue on post-conviction review, finding that such review was barred by *res judicata* because the issue had been raised and disposed of on direct appeal. *People v. Silagy*, 116 Ill.2d 357, 367, 107 Ill.Dec. 677, 507 N.E.2d 830 (1987).

This court is bound by the factual determinations of the Illinois Supreme Court unless the record shows that there is no basis for such determinations. *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *United States ex rel. Cosey v. Wolff*, 682 F.2d 691, 693 (7th Cir.1982). The record shows ample basis for the Illinois Supreme Court's conclusion that the trial court did not abuse its discretion in denying Silagy's motion to dismiss the juror.

(2)

The petitioner also alleges that the jury considered off-the-record evidence in the form of media coverage and one juror's personal input. In disposing of his petition for post-conviction relief, the Illinois Su-

preme Court addressed this claim. That court stated:

> Because the actual effect of the complained-of-conduct on the minds of the jurors cannot be proved, this court has held that "the standard to be applied is whether the 'conduct involved "such a probability that prejudice will result that it is [to be] deemed inherently lacking in due process." ' " (*People v. Holmes* (1978), 69 Ill.2d 507, 514 [14 Ill.Dec. 460, 372 N.E.2d 656], quoting *Estes v. Texas* (1965), 381 U.S. 532, 542–43, 14 L.Ed.2d 543, 550, 85 S.Ct. 1628, 1633; *People v. Tobe* (1971), 49 Ill.2d 538, 544 [276 N.E.2d 294].) We consider that the juror's affidavit concerning jurors' alleged discussion of news reports did not demonstrate that the jury deliberations were so affected as to deprive the defendant of due process. Assertions of exposure to media coverage do not of themselves demonstrate prejudice to a defendant. (*People v. Lieberman* (1986), 149 Ill. App.3d 1052, 1057 [103 Ill.Dec. 480, 501 N.E.2d 797].) Considering the record before us, we cannot say the judge's denial of an evidentiary hearing on this claim was manifestly erroneous. (*People v. Griffin* (1985), 109 Ill.2d 293, 303 [93 Ill.Dec. 774, 487 N.E.2d 599]; *People v. Bracey* (1972), 51 Ill.2d 514 [283 N.E.2d 685].) If a juror did comment to other jurors that the defendant was a bad person, it must, however, be presumed, absent a showing to the contrary, that they jury followed the court's instructions in reaching a verdict. Too, the defendant confessed before the jury that he had killed the two women; his mother had testified that she and the defendant's sister had been raped by the defendant. We can be certain that the juror's remark, if made, did not affect the jury's appraisal of the defendant's character.

*People v. Silagy*, 116 Ill.2d 357, 366–67, 107 Ill.Dec. 677, 507 N.E.2d 830 (1987).

Again, because there is ample basis in the record, the court finds itself bound to accept the factual findings of the Illinois Supreme Court.

**(3)**

■ Finally, Silagy argues that the jury's sentencing verdict was affected by consideration of off-the-record, inaccurate information regarding the punishment he would receive if the jury did or did not impose the death penalty. Silagy claims that the jury discussed that if sentenced to life imprisonment he would serve only five to seven years in prison. If the jury imposed the death penalty, on the other hand, he would never be executed but would remain incarcerated for longer than seven years.

In the post-conviction case, the Illinois Supreme Court found that this claim was also properly dismissed on the ground that "affidavits or testimony to show 'the motive, method, or process by which the jury reached its verdict' is not admissible." *People v. Silagy*, 116 Ill.2d at 367, 107 Ill.Dec. 677, 507 N.E.2d 830 (citations omitted).

Federal Rule of Evidence 606(b) also supports that position.

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The discussions about the number of years Silagy would actually serve if he were sentenced to life imprisonment rather than being sentenced to death were not based on extraneous matter but were rather based on a juror's erroneous ideas. The jurors were talking about whether or not the

death penalty would be justified in this case. The fact that they discussed what they thought the actual result would be were Silagy sentenced to life imprisonment rather than execution, does not invalidate the proceeding.

Accordingly, this ground for habeas relief is denied.

## WAIVER OF COUNSEL AND MITIGATING EVIDENCE AT CAPITAL SENTENCING PROCEEDING

■ 1. Silagy alleges that he was not mentally competent either to waive his constitutional right to counsel or to represent himself at the sentencing proceeding or to decide not to offer mitigating evidence at the sentencing proceeding.

With respect to his waiver of counsel at the sentencing proceeding, the Illinois Supreme Court determined that Silagy was competent. Responding to Silagy's suggestion that the extreme stress resulting from the trial might have triggered anxiety neurosis so that he was not competent to make an intelligent waiver of counsel, the Illinois Supreme Court stated:

Immediately after the defendant had been found guilty of the offenses charged, he asked that he be allowed to proceed without counsel. The court allowed the defendant to reconsider his request overnight. The following day he again made the request and the court questioned the defendant. This examination included:

"THE COURT: Do you think you understand the severity of this, and do you understand what you are doing? Do you think you understand what the actual circumstances are?

THE DEFENDANT: Yes, sir.

THE COURT: You've thought about this for some time, have you?

THE DEFENDANT: Yes.

THE COURT: Have you discussed this with your attorney, that this is what you want to do?

THE DEFENDANT: Yes, I have very thoroughly.

THE COURT: And you feel this is the way you want to proceed?

THE DEFENDANT: Yes, sir.

THE COURT: Does Counsel have anything else that they think that this defendant should be apprised of?

COUNSEL: No, your Honor."

It was explained to the defendant that his attorneys would continue to sit at the counsel table and advise him as to how to proceed, but that all decisions would be made by him and that his attorneys would not address the court without the defendant's consent. The defendant's request to proceed without counsel was "due to the fact that their ethics of law, I would not ask them to go against their work. It was my decision to carry out what will happen." The defendant then stated that his decision was made freely and voluntarily without threats, promises, or coercion. The court made this finding:

"[t]hat the Defendant is a responsible person who is under no mental disability and who is knowingly, intelligently, and understandingly, electing to proceed in his defense as he suggested. The court further finds that the Defendant understands the nature of the charges for which he's been convicted, the seriousness of the possible penalties in the case, and has freely and voluntarily undertaken to act as his own attorney with assistance from his Counsel who are present at all times whenever he requested that Counsel for any assistance from them.

Do you have any objections to that statement, Mr. Silagy?

THE DEFENDANT: No, Your Honor.

THE COURT: That is a true statement?

THE DEFENDANT: It is a true statement.

THE COURT: At this time the Court will rule that the Defendant has a right to proceed as he has requested representing himself with his attorneys advising him in any respect he wishes. And the attorneys can participate and perform all the usual func-

tions as Defense Counsel as requested by the defendant or not participate as directed by the Defendant from time to time."

*People v. Silagy,* 101 Ill.2d 147, 176–78, 77 Ill.Dec. 792, 461 N.E.2d 415 (1984). In disposing of a related claim, the Illinois Supreme Court stated further:

It is clear that the sixth amendment to the Constitution of the United States (U.S. Const., amend. VI) provides for the right of self-representation in criminal proceedings. (*Faretta v. California* (1975), 422 U.S. 806, 45 L.Ed.2d 562, 95 S.Ct. 2525; see also, Ill. Const. 1970, art. I, sec. 8.) The " 'right of a defendant to represent himself, when his choice is intelligently made, is as basic and fundamental as his right to be represented by counsel.' " (*People v. Nelson* (1971), 47 Ill.2d 570, 574 [268 N.E.2d 2]; *People v. Bush* (1965), 32 Ill.2d 484, 487 [207 N.E. 2d 446].).... Although a court may consider his decision unwise, if it is freely, knowingly and intelligently made, that decision must be accepted out of "that respect for the individual which is the lifeblood of the law." *Illinois v. Allen* (1970), 397 U.S. 337, 350–51, 25 L.Ed.2d 353, 363, 90 S.Ct. 1057, 1064 (Brennan, J., concurring).

The record shows that the trial court fully informed the defendant of the relevant substantive and procedural law involved. The defendant was informed of the possible sentencing alternatives. His decision was made after consultation with his attorneys. He was obviously aware of the possibility of being sentenced to death, since that was the punishment he requested. The record is clear that Silagy's decision to discharge his counsel was knowingly and intelligently made.

There is no suggestion that the defendant was suffering any impairment of reasoning ability at the time of his waiver of counsel. He showed understanding of the law, asked intelligent questions, and did not demonstrate any of the symptoms which he said had accompanied the disturbed episodes that he described. Dr. Ziporyn, who testified for the defendant, reported that he understood the nature of the charge and could cooperate with his attorney. The jury had found he was not insane at the time of the murders. The defendant's attorneys did not advise the trial court of any indication of an inability of the defendant to make a rational decision concerning the discharge of counsel, as the attorneys would have had a duty to do. The reasons the defendant expressed for discharging his attorneys and desiring a sentence of death were not irrational (he feared their ethical duty prevented them from carrying out his wishes to be given a death sentence, and he wished to be sentenced to death because of feelings of guilt and remorse, a desire to spare his parents from further agony because of his conduct, his dread of confinement in the penitentiary, and a desire to die with grace and dignity). There simply is no showing that Silagy was suffering under a reactive psychosis at trial or was otherwise mentally incapable of making an intelligent waiver of counsel. We note, too, that even Dr. Ziporyn testified that the defendant did not suffer a loss of intellectual function during his periods of disturbance.

*Id.* 101 Ill.2d at 179–81, 77 Ill.Dec. 792, 461 N.E.2d 415.

This court is bound by the factual determinations of the Illinois Supreme Court unless the record shows that there is no basis for such determinations. The record shows ample basis for the Illinois Supreme Court's conclusion that Silagy's competence to waive counsel at the sentencing proceeding was made knowingly and intelligently.

Because it has been determined that Silagy's waiver of counsel was knowingly and intelligently made, it follows that his waiver of mitigating evidence at the sentencing proceeding was also knowingly and intelligently made.

The petitioner now argues that there were various alternatives by which all available mitigating evidence could have been presented to his sentencing jury. He suggests that: stand-by counsel could have

argued mitigating evidence; the court could have called its own witnesses; the court could have appointed a special counsel to present mitigating evidence; or the court could have admitted a presentence investigation report into evidence. Adopting one of these alternatives, Silagy says, would have allowed the sentencing jury to perform its constitutionally mandated function of assuring that the penalty of death is appropriate and individualized.

Silagy argues that any of these alternatives would have coalesced perfectly with the law in this jurisdiction and cites *United States v. Taylor,* 569 F.2d 448, 452 (7th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978), for the proposition that:

> [F]aretta holds that an accused has a constitutional right to dispense with the assistance of counsel and to conduct his defense personally. It does not inevitably follow, however, that this right of self-representation comprehends any correlative right to preclude the trial court from appointing counsel and authorizing him to participate in the trial over the accused's objection in order to protect the public interest in the fairness and integrity of the proceedings. (Footnote omitted.)

The facts of *Taylor,* however, are readily distinguishable from those in the present case. In *Taylor* the court appointed standby counsel to assist a *pro se* defendant at trial who had previously indicated that he felt unqualified to put on his own defense. *Id.* at 451. It was only after the defendant stated, and it became clear, that he would take no part in the proceedings, that the trial court lifted its initial ban on appointed counsel's participation. It was following the recitation of these facts that the *Taylor* court made the above quoted statement. In the present case, however, Silagy never indicated that he believed himself to be unqualified, and rather than refusing to participate in the sentencing proceedings, he dismissed counsel so as to be able to participate.

More importantly, the court finds that the petitioner's argument that the court should have employed alternative means to present mitigating evidence collides squarely with the reasoning of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1974). In *Faretta,* the Supreme Court observed initially that there existed a "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817, 95 S.Ct. at 2532. *Faretta* also noted that the structure of the Sixth Amendment supports the right of self-representation: This amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Id.* at 819, 95 S.Ct. at 2533.

The Supreme Court was aware that in most criminal cases defendants could present a better defense with the help of counsel than without it. The Court, however, explicitly refused to allow this fact to undercut a defendant's right to proceed *pro se.*

> The right to defend is personal. The defendant, not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." (Citation omitted.) (Brennan, J., concurring.)

*Id.* at 834, 95 S.Ct. at 2540.

Under *Faretta* and its progeny, exercise of the Sixth Amendment right to self-representation is unqualified before the trial begins. *Faretta* at 818–21, 95 S.Ct. at 2532–34; *United States v. Brown,* 744 F.2d 905, 908 (2nd Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984). Once the trial is in progress, the judge may curtail the right upon finding that the legitimate interests of the defendant are outweighed by potential disruption of the proceedings already in progress. *United*

States v. Brown, 744 F.2d at 908; United States v. Wesley, 798 F.2d 1155, 1155 (8th Cir.1986). There are no allegations and the record contains no evidence that Silagy's presentation to the sentencing jury was in any way disruptive of the proceedings.

Additionally, the Seventh Circuit has rejected the notion that the court should intervene if it becomes apparent that the *pro se* litigant is unable to defend himself. In *United States v. Moya–Gomez,* 860 F.2d 706, 741 (1988), the court adopted the reasoning of the Sixth Circuit in *United States v. McDowell,* 814 F.2d 245 at 251 (6 Cir. 1987):

> The only thing that was "unfair" about McDowell's trial was that he did not represent himself very well. . . . However, as the Supreme Court stated in *Faretta,* "whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' " (Citation omitted.) We think this logic applies equally to preclude the instant "fair trial" claim. The district court accorded McDowell his full constitutional rights at trial. (Citation omitted.)

Based on the foregoing, this claim also fails.

### CONSIDERATION OF PSYCHIATRIC TESTIMONY IN PHASE TWO OF CAPITAL SENTENCING PROCEEDING

■ The petitioner alleges that neither he nor his attorneys were informed that the psychiatric testimony used at trial to rebut the defense of insanity would be used by the State in phase two of the capital sentencing proceeding as aggravating factors to be weighed in determining whether the death penalty should be imposed. Silagy says this denied his Fifth Amendment right not to incriminate himself and his Sixth Amendment right to the effective assistance of counsel. In support of his position, the petitioner relies on the Supreme Court's decision in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Estelle v. Smith,* the Court considered whether:

> [T]he admission of [a psychiatrist's] testimony at the penalty phase violated respondent's Fifth Amendment privilege against compelled self-incrimination because respondent was not advised before the pretrial psychiatric examination that he had a right to remain silent and any statement he made could be used against him at a sentencing proceeding.

*Id.* at 461, 101 S.Ct. at 1872. The Court held that the Fifth Amendment privilege against self-incrimination applied to the unwarned statements that the respondent made to the court-appointed psychiatrist. *Id.* at 463, 101 S.Ct. at 1873.

The petitioner acknowledges that the holding in *Estelle v. Smith* "was limited to the situation where the criminal defendant neither initiated a psychiatric evaluation nor introduced any psychiatric evidence at trial. *Estelle v. Smith,* 451 U.S. at 468 [101 S.Ct. at 1875]." (Page 131, Petitioner's Memorandum in Support of Petition for Writ of Habeas Corpus.) Nonetheless, he argues that subsequent cases have held that "the fact that the defense requested the examination does not obviate the necessity for giving the *Miranda* warnings where the defense did not request . . . an examination on the question of future dangerousness." *Battie v. Estelle,* 655 F.2d 692, 702 (5th Cir.1981); *Accord Booker v. Wainwright,* 703 F.2d 1251, 1256 (11th Cir.), *cert. denied,* 464 U.S. 922, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983). *See* Petitioner's Memorandum, p. 131.[2]

Both *Estelle v. Smith* and *Battie v. Estelle* arose under the Texas death penalty statute that requires the jury to assess the defendant's future dangerousness. *Estelle v. Smith,* 451 U.S. at 457–58, 101 S.Ct. at

2. *Booker* is completely distinguishable since in that case the prosecutor used the psychiatric evidence to impeach Booker's statements during the penalty phase of the trial. The *Booker* court held that "even assuming Booker's statements would not have been admissible in the state's case, there is no constitutional prohibition against using the information for impeachment purposes." *Booker,* 703 F.2d at 1258.

1870–71. In Texas, because the state must prove future dangerousness beyond a reasonable doubt in a death penalty proceeding, the involuntary, unwarned statements to the court-appointed psychiatrist violate the Fifth Amendment. But in Illinois, future dangerousness is not an element of the state's case for the availability of death as a penalty. Ill.Rev.Stat. ch. 38, ¶ 9–1(b). In Silagy's case the jury did not consider the psychiatrists' testimony in deciding whether death was an appropriate punishment.

Finally, and what is determinative on this issue, the court notes that "volunteered statements ... are not barred by the Fifth Amendment...." *Estelle v. Smith,* 451 U.S. at 469, 101 S.Ct. at 1876. Silagy voluntarily allowed the psychiatrists' testimony to be considered at the death penalty hearing. Record at 919. Accordingly, the court concludes, based on the above discussion, that the petitioner's Fifth Amendment rights were not violated by the use of the psychiatrists' testimony at the death penalty hearing.

With regard to the petitioner's Sixth Amendment claim, the court notes that it was never presented to the Illinois courts. The petitioner has not shown cause and prejudice for that procedural default. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Accordingly, this ground also fails.

### ADDITIONAL CLAIMS

■ The petitioner also advances two additional grounds for habeas relief which have no merit but should be mentioned. First, at the time Silagy asked to be given the death penalty, the method of execution in Illinois was by electrocution. Subsequent to Silagy's sentencing, the method of execution was changed to lethal injection. The petitioner claims that lethal injection is a cruel and unusual punishment. There is nothing in the record that supports that contention. The Eighth Amendment does not guarantee a convicted defendant the right to select the method by which punishment will be inflicted.

Second, the petitioner says that erroneous information was put before the jury that the victims were sisters. The source of that erroneous fact seems to be Silagy's confession in which he referred to the victims as sisters. This claim of error was never presented to the state court and there is no support in the record that there was cause for that default or that the petitioner was prejudiced by reference to the victims as sisters. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977).

Both these claims fail.

### CONSTITUTIONALITY OF ILLINOIS STATUTE

■ The Illinois death penalty statute provides that the sentence of death may be considered only "where requested by the State." Ill.Rev.Stat. ch. 38, § 9–1(d) (1979). This means that only where the local state's attorney asks the court to consider imposition of the death penalty will the court hold a sentencing proceeding in which that penalty may be imposed. Four Justices of the Illinois Supreme Court have joined in writing that the statute violates the provisions of the Eighth Amendment to the federal Constitution. *People ex rel. Carey v. Cousins,* 77 Ill.2d 531, 34 Ill.Dec. 137, 397 N.E.2d 809 (1979) (Ryan, J., Goldenhersh, C.J., and Clark, J. dissenting), *cert. denied,* 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980); *People v. Lewis,* 88 Ill.2d 129, 58 Ill.Dec. 895, 430 N.E.2d 1346 (1981) (Simon, J., dissenting), *cert. denied,* — U.S. —, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988). Those dissents constitute an articulate and persuasive statement of the basis for holding the Illinois statute unconstitutional under the Eighth Amendment. The dissents contain an exhaustive discussion of the controlling United States Supreme Court precedents. This court cannot improve upon those statements and discussions and therefore embraces and adopts them as its own. Justice Ryan points up specifically how the Illinois statute allows arbitrary and capricious imposition of the death penalty.

The risk of arbitrary and capricious action under section 9–1(d) is most vividly demonstrated by the case of *People v. Greer,* [79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980)] Docket No. 51214, which was only recently argued before this court. In that case the prosecutor requested the penalty hearing, and the death penalty was imposed upon the defendant. At oral argument before this court, the Attorney General confessed error and stated that this is not a case in which the death penalty should be imposed. Furthermore, this court was informed in oral argument that the State's Attorney who had prosecuted the case is no longer in office and that his successor agrees with the Attorney General. Greer's case clearly shows that because of the lack of adequate guidelines the decision to request or not to request a penalty hearing will, to a great degree, depend upon the whim of the individual prosecutor. Without legislatively enacted guidelines, the differences in prosecutors, though they be sincere in their beliefs, will inevitably lead to arbitrary and capricious action. Fortunately, this court is in a position to correct an unauthorized imposition of the death penalty. However, the statute may well be rendered arbitrary and capricious in its application by the fact that many prosecutors, in the exercise of unguided discretion, will not request a penalty hearing, whereas other prosecutors, faced with the same set of facts, will request such a hearing, and the death penalty may be imposed.

In *Gregg v. Georgia,* Mr. Justice Stewart stated: "Because of the uniqueness of the death penalty, *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] held that it could not be imposed under *sentencing procedures that created a substantial risk* that it would be inflicted in an arbitrary and capricious manner * * *.

\* \* \* \* \* \*

*Furman* mandates that *where discretion is afforded a sentencing body* on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." (Emphasis added.) (*Gregg v. Georgia* (1976), 428 U.S. 153, 188–89, 49 L.Ed.2d 859, 883, 96 S.Ct. 2909, 2932.)

Our statute contains no directions or guidelines to minimize the risk of wholly arbitrary and capricious action by the prosecutor in either requesting a sentencing hearing or in not requesting a sentencing hearing. The vague belief of the majority that the State's Attorney will not request such a hearing unless he believes that there will be evidence which will persuade a jury that the requisite elements for a death sentence exist is meaningless. Such belief, although the prosecutor may be sincere, will not "minimize the risk of wholly arbitrary and capricious action" unless the exercise of discretion by the prosecutor is aided, directed and limited by guidelines prescribed by the legislature.

*People v. Cousins,* 77 Ill.2d at 558–69, 34 Ill.Dec. 137, 397 N.E.2d 809 (Ryan, J., dissenting).

■ The lack of an adequate notice provision in the statute as to when the death penalty will be sought is also a constitutional defect. It affects the defendant's right to effective counsel as well as his right to basic due process. The prosecutor may withhold the decision to seek the death penalty until after a finding of guilt has been returned. Ill.Rev.Stat. ch. 38, ¶ 9–1(d) (1979). A lawyer and a defendant need to know as soon as possible whether the death penalty will be sought. That knowledge affects their decisions on what type of defense will be made, what plea bargaining can be done, and whether a jury trial should be waived. *See People ex rel. Carey v. Cousins,* 77 Ill.2d at 560–61, 34 Ill. Dec. 137, 397 N.E.2d 809 (Ryan, J. dissenting).

In summary, none of the claims raised as grounds for habeas relief has merit, with the exception of the one challenging the constitutionality of the Illinois death penal-

ty statute. For the reasons stated in this order, that claim has merit and the statute violates the precepts of the Eighth and Fourteenth Amendments to the United States Constitution.

IT IS ORDERED that a writ of habeas corpus issue in this case vacating the petitioner's sentence of death. The State has 120 days to resentence the petitioner, or he shall be released.[3]

On the court's own motion, the execution of this order is stayed pending appeal by the parties.

---

**3.** For similar relief *see North Carolina v. Pearce,* 395 U.S. 711, 714, 89 S.Ct. 2072, 2074, 23 L.Ed. 2d 656 (1969).