Docket No. 107701.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEVELL TAYLOR, Appellant.

*Opinion filed March 18, 2010.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

Chief Justice Fitzgerald took no part in the decision.

## OPINION

Defendant, Levell Taylor, petitioned the circuit court of Cook County for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122–1 *et seq.* (West 2000)). Following an evidentiary hearing, the circuit court denied defendant's petition. The appellate court affirmed. No. 1–06–0938 (unpublished order under Supreme Court Rule 23). We allowed defendant's petition for leave to appeal (210 Ill. 2d R. 315), and now affirm the judgment of the appellate court.

# I. BACKGROUND

## A. Trial

Defendant, his brother Lowell Taylor, and Duante Anderson were jointly charged with the first degree murder of the victim, Bruce Carter. See 720 ILCS 5/9–1(a)(1), (a)(2) (West 2008). The events leading to the victim's death were uncontested at trial.

On the afternoon of August 11, 1996, Tyeshia Clinton's mother hosted a barbeque at her home near 52nd Street and Lowe Avenue. A south side Chicago streetgang (hereafter south side gang) claimed that area as part of its turf and referred to it colloquially as "Motown." Approximately 13 or 14 south side gang members had gathered in the front yard. At approximately 7 p.m., six of Clinton's friends arrived for the party, including Keith Baker and the victim. Clinton's friends belonged to a rival west side Chicago streetgang. The victim drove these friends to the party in his brother's car. The victim parked the car on the side of the Clintons' house.

Upon their arrival, the six friends greeted Clinton in the front yard, and then four of them entered the house. The victim, Baker, and Clinton remained in the front yard conversing. Almost immediately, they were approached by a group of south side gang members that included Anderson, defendant, and Lowell. Anderson shouted at the three friends: "You don't know where you at. You in Motown." Anderson then approached the victim and punched him in the face. A melee ensued wherein the south side gang members, including Anderson, defendant, and Lowell, forced Baker and the victim to the ground and kicked them. Also, the victim's car windows were smashed. Baker and the victim broke away from their attackers and, with Baker in the lead, ran toward the front door of the house. Witnesses heard two gunshots. The victim was shot once in the upper right arm. He fell into Baker, who carried him into the house. The victim died shortly thereafter in the living room. A subsequent autopsy revealed that the victim had been shot at very close range, that the bullet traversed his torso and lodged in the lower left chest cavity, and that the victim internally bled to death.

At approximately 9 p.m., Chicago Police Detective James O'Brien interviewed Baker and several other witnesses. Baker identified Anderson as the person who had punched the victim,

defendant as the person who had passed a gun to Lowell, and Lowell as the person who had actually shot the victim. Detective O'Brien also interviewed Phillip Marshall, who was a 16-year-old member of the south side gang. On August 12, 1996, Marshall testified before a grand jury. Marshall testified that he had known Anderson, defendant, and Lowell all of his life. Also, Marshall testified that on the night of August 11, he was standing across the street from the Clintons' front yard. Marshall testified that he saw the melee begin, heard gunshots, and then saw everyone run. Marshall further testified that he saw Lowell holding a gun as he was running from the scene. The grand jury indicted Anderson, defendant, and Lowell for first degree murder.

Anderson, defendant, and Lowell were jointly tried. Anderson was represented by his own trial counsel, and defendant and Lowell were both represented by Raymond Prusak. Anderson and defendant waived their right to a jury and received a bench trial, while Lowell received a jury trial.

As indicated by opening statements and closing arguments, the State's theory of the case was that Lowell was guilty of first degree murder because Lowell shot the victim, and that Anderson and defendant were legally accountable for Lowell's acts. Baker testified that he saw Anderson punch the victim, that he saw defendant hand a gun to Lowell, and that he saw Lowell shoot the victim. The State called Marshall as a witness, but he recanted his grand jury testimony implicating Lowell. On cross-examination, Marshall testified that he implicated Lowell before the grand jury based on police promises of leniency and threats of charging him in the case if he failed to do so. Detective O'Brien and Chicago police officer Thomas Glynn, who picked up Marshall for questioning, each testified that he never threatened Marshall or offered Marshall any favors in exchange for implicating Lowell. Marshall's grand jury testimony was read into the trial record for purposes of impeachment. The gun was never recovered and no gunpowder residue tests were performed on Lowell or defendant.

The defense theory for each defendant was that the State failed to prove him guilty of the charged offense beyond a reasonable doubt. Each defendant did not testify, or present any witnesses or other evidence. Anderson's trial counsel and Prusak each cross-examined

-3-

the State's witnesses. In closing argument, Anderson's trial counsel and Prusak each attacked the credibility of the State's witnesses and described purported discrepancies in their testimony.

The jury convicted Lowell, and the trial court convicted defendant, of first degree murder. The court found that defendant handed the gun to Lowell, and therefore was legally accountable for the actions of Lowell, the shooter.[1] On October 28, 1998, at the close of a sentencing hearing, the court sentenced Lowell to 45 years' imprisonment and sentenced defendant to 35 years' imprisonment.

Defendant and Lowell separately appealed from their respective convictions; the appellate court consolidated the two appeals. Each claimed, *inter alia*, ineffective assistance of counsel arising out of an alleged conflict of interest in trial counsel's joint representation of them. The appellate court affirmed defendant's conviction and sentence. *People v. Taylor*, Nos. 1–99–0074, 1–99–1982 cons. (2001) (unpublished order under Supreme Court Rule 23).

### B. Postconviction

On November 15, 2001, defendant filed a postconviction petition, again claiming ineffective assistance of counsel based on an alleged conflict of interest arising out of Prusak's joint representation of defendant and Lowell. The petition alleged that "potential defense witnesses" were at the scene of the shooting and were willing to testify on defendant's behalf. The petition further alleged that Prusak did not call them because "they would make his other client [Lowell] the shooter."

Defendant attached affidavits from himself, codefendant Anderson, his parents Joyce and Alfonso Parker, Michael Woods, and Teddy Plummer. Defendant, Anderson, Woods, and Plummer averred that each knew the others; that each was at the party; and that each saw Lowell fire a gun at the victim. Defendant further averred that he did not hand a gun to Lowell. Anderson, Woods, and Plummer

---

[1]The trial court acquitted Anderson, finding: "[A]lthough he may have been the instigator," his part "was minimal. There's nothing to show that he had knowledge of any weapons or did anything other than punch [the victim]."

-4-

likewise stated that defendant did not hand a gun to Lowell and, further, that defendant was not even involved in the fight. Defendant, Woods, and Plummer further averred that each went to Prusak's office; that each gave Prusak this information; and that Prusak told them that their testimony would not be needed because it would hurt defendant's case, and that defendant "had nothing to worry about" or "had the case beat." Joyce and Alfonso Parker each averred that they brought three persons, including Woods and Plummer, to Prusak's office to offer their testimony. According to the Parkers, Prusak "said he could not call them as witnesses because they would convict Lowell. He said [defendant] 'had the case beat' anyway." The Parkers each further averred: "Each time we spoke to Mr. Prusak about witnesses he told us they were not necessary since there was no way [defendant] could be found guilty."

The State moved to dismiss defendant's postconviction petition without an evidentiary hearing. The circuit court denied the motion to dismiss and held an evidentiary hearing.

The following witnesses testified on behalf of defendant. Joyce Parker testified that she retained Prusak to represent both defendant and Lowell. Joyce had retained Prusak to represent defendant in a prior criminal prosecution.[2] Joyce was satisfied with Prusak's performance in the prior case and trusted him. Joyce knew that Lowell was accused of shooting the victim and defendant was accused of handing the gun to Lowell.

Sometime in 1997, Joyce and her husband brought defendant, who was released from jail on bond, Plummer, Woods, Rufus Bingham, and Natavian Simms[3] to Prusak's office. After interviewing

---

[2]The record shows that in 1994, defendant was charged with multiple counts of aggravated battery, armed violence, and aggravated discharge of a firearm. The State entered a *nolle prosequi* on all counts except one count of aggravated battery. Defendant was convicted on that count and sentenced to two years' imprisonment. Joyce believed that defendant "was in jail approximately 17 months."

[3]Simms briefly testified at the evidentiary hearing. He was nowhere near the crime scene and lacked any personal knowledge of the shooting. He was present at the meeting with the others in Prusak's office, and he testified

these persons, Prusak informed them that he would not call them as witnesses on defendant's behalf "because they would hurt Lowell's case." Joyce met with Prusak several times, during which she raised the issue of a conflict of interest between defendant and Lowell. Prusak repeatedly assured Joyce and defendant that "he did not need the witnesses because they had nothing on [defendant]," and that Joyce and defendant "had nothing to worry about." Joyce was not happy with Prusak's decision not to call the proffered witnesses. However, Joyce did not consider firing Prusak and retaining another attorney because she had already paid Prusak "so much money at that time" that she could not afford to retain another attorney.

Rufus Bingham testified as follows. He was at the scene of the crime, where he saw Lowell shoot the victim and where he did not see defendant hand a gun to Lowell. Bingham related what he saw to Prusak. However, Prusak would not call Bingham and the other proffered witnesses because their testimony would be worse for Lowell. On cross-examination, Bingham revealed that he had five prior felony convictions, was a friend of defendant, and was a fellow south side gang member. Further, Bingham admitted that he talked about the case with Anderson and Simms, who are also south side gang members. Although Bingham told Prusak that defendant did not give a gun to Lowell, Bingham disclosed that he never said so to law enforcement officials. Immediately following the shooting, Bingham was taken to a police station where police and an assistant State's Attorney questioned him. Bingham knew that defendant was under arrest for the shooting. However, Bingham acknowledged that he failed to mention anything about defendant during his interviews, including that defendant did not hand a gun to Lowell.

Plummer testified that he was present at the shooting, that he saw Lowell shoot the victim, and that he told police that Lowell was the shooter. Also, consistent with his affidavit, Plummer testified that not only did defendant not hand a gun to Lowell, but that defendant was not even with the group of people near the shooting. At the group meeting with Prusak, Plummer related this information and added that defendant did not hand a gun to Lowell but, rather, Lowell

only that the meeting occurred.

-6-

possessed the gun at all times. Prusak responded that Plummer "would hurt both of his clients" if Plummer testified. On cross-examination, Plummer disclosed that he had prior convictions for two felonies and one misdemeanor. Plummer acknowledged that he is friends with both defendant and Lowell. Although Plummer denied being a member of the south side gang with defendant and Lowell, Plummer explained that he was a member of another streetgang, and that "those two gangs get along." Plummer also admitted that he never told police that defendant did not have a gun or hand a gun to Lowell.

Anderson testified that he did not see Lowell shoot the victim, but that he saw Lowell holding a gun after the shooting. According to Anderson, defendant did not hand a gun to Lowell because defendant was away from Lowell; defendant "was on the side of the building destroying the [victim's] car." However, Anderson admitted that he could not actually see defendant from where Anderson was located. Anderson revealed that he had prior convictions for four felonies and one misdemeanor. Anderson acknowledged that he was a friend of defendant and a fellow south side gang member.

Defendant testified as follows. He and his parents went to Prusak's office and spoke with him on three occasions. On the second visit, they brought Plummer, Woods, Bingham, and Simms. Prusak told defendant that he did not need to testify at his trial. According to defendant: "He [Prusak] said it wasn't necessary. He said I already had my case beat." Defendant told Prusak that he saw Lowell shoot the victim, but that he did not give Lowell the gun.

On cross-examination, defendant acknowledged that his parents paid Prusak "a lot of money" to represent him in his murder case. Defendant expected Prusak's representation to result in a finding of not guilty. Defendant acknowledged that he was angry about being convicted and sentenced to 35 years' imprisonment, and that he was "especially angry" with Prusak because he did not call defendant's proffered witnesses to testify. Defendant repeated that he did not hand a gun to Lowell, and added that he did not even participate in the attack on Baker and the victim. Rather, during the attack, defendant was on the side of the Clinton's house "busting out his [the victim's] car windows." Upon further questioning, defendant repeated: "I was busting out the car windows. I was the one busting out the car

windows."[4] Defendant further acknowledged that he was still a south side gang member; that he was friends with fellow gang members Bingham and Plummer; and that he gave their names and addresses, among others, to Prusak. Although defendant was arrested only about two hours after the shooting, defendant admitted that he did not mention any of these proffered witnesses to the police or the assistant State's Attorney who questioned him.

The State called Prusak, who testified as follows. He was admitted to the Illinois bar in 1980, and criminal law was "the major portion" of his practice. By the time of defendant's and Lowell's 1998 murder trial, Prusak had tried between 25 and 50 murder cases, both bench and jury trials. In some of his prior murder trials, Prusak had jointly represented codefendants. When codefendants request his joint representation, "the first thing" Prusak considers is whether an actual or potential conflict of interest exists. Prusak did not perceive a conflict of interest in this case. He testified: "The trials were severed. They were going to be separate juries or one was going to take a bench trial. From the beginning we all knew that [defendant] was going to have a bench trial because we all believed that the case against him was fairly weak." Prusak remembered that he had represented defendant in a prior case.

Prusak recalled meeting with defendant and family members in his office several times. Although Prusak did not remember Bingham and Plummer specifically, Prusak did recall that several putative witnesses came to his office on one occasion with defendant's family. Prusak clarified that he never categorically decided *not* to call *any* witnesses on behalf of defendant. Rather, according to Prusak, there was never any clear-cut reason to call those witnesses.

When questioned why Prusak believed that there was no reason to call defendant's putative witnesses, Prusak testified that he had reviewed copies of the police reports. He explained that defendant's case "was a single finger I.D. case, meaning there was only one person who had identified [defendant as the person] who had actually handed a gun to his brother who in turn shot the victim." Prusak

---

[4]Defendant could not explain why he smashed the victim's car windows, only that he "just did it."

noted that there were only two eyewitnesses: Marshall, who saw Lowell holding the gun; and Baker, who saw defendant hand the gun to Lowell. Prusak reasoned:

> "So essentially there were two witnesses, one was a flipper, one stuck to his story but both of those witnesses had convictions. They were both gang members and they both had lied in the past and I felt that neither of them would be credible witnesses to support a first degree murder conviction."

Indeed, it was because Prusak viewed the State's case as "very weak" that he requested a bench trial for defendant and took a jury trial for Lowell.

Prusak was asked whether he decided to try defendant and Lowell before separate triers of fact because he knew that he had a conflict of interest. Prusak responded as follows:

> "No. One was a bench trial ***. One was a jury trial. One client had a great case and *** you don't risk it in front of a jury. You leave it up to a judge on a single-finger I.D. case. The other client is obviously guilty. You just try your best with the jury and hope for the best. That's why I took a jury on one and I took a bench on the other."

In addition to viewing the State's case as very weak, Prusak also considered the strength or weakness of the putative witnesses who had visited his office. Prusak remembered that two of them had already spoken to police. Prusak compared what they told police to what they, and defendant, told him. Defendant told Prusak that he arrived at the party with Lowell and several other friends.[5] Defendant further told Prusak that when the brawl ensued on the front yard of the Clinton house, defendant was on the side of the house breaking out the victim's car windows–with a gun. According to Prusak: "So they all–so while his brother [Lowell] and the other gentleman [Anderson] were making a confrontation he [defendant] was out breaking windows using a firearm to break the windows with, not

---

[5]After a colloquy with counsel, the court correctly determined that the attorney-client privilege had been waived. See *People v. Griffin*, 109 Ill. 2d 293, 303 (1985).

shooting it but using it to break the windows." On cross-examination, Prusak was asked whether defendant told Prusak that defendant never handed a gun to Lowell. Prusak answered:

> "He did tell me that he had a gun and that he was breaking windows with the gun. You are correct, he never told me that he handed the gun back then to his brother. But I never asked him that question, sir, because I didn't want to hear the answer to it."

In contrast to what defendant told Prusak, defendant told police that he was two houses away when the brawl began. Prusak explained: "I had to take into account what [defendant] had told me in private and what these other two gentlemen were saying to me in light of what they told the police and in light of their backgrounds and in light of the whole, whether they contradicted each other or not."

Following that comparison, Prusak decided not to call defendant's proffered witnesses to testify. Prusak explained that the witnesses were inconsistent: "One put [defendant] at one place, one put [defendant] at another place." Further, according to Prusak: "I knew that after, once they opened their mouth and how they presented themselves in my office that they would not make a good impression upon [the trial judge] because they made a terrible impression upon me." Prusak explained that if he called the witnesses, he "would just be handing the State ammunition to lose a case," which, he believed, in his words, "was weak to begin with, which I thought we had a very good chance of winning and I didn't want to lose the chance of winning the case by calling witnesses who in my opinion were not credible."

Prusak would have presented evidence on behalf of defendant if Prusak "had evidence that would help him [defendant] and it was credible evidence and it wasn't tainted by a conviction or inconsistency or somehow I would not be suborning perjury by [presenting] that evidence." For example, Prusak testified that he asked Lowell to testify for defendant, but Lowell "just shook his head and walked away from me." Prusak explained: "And if I'm begging his [defendant's] brother in the lockup to testify I would have gladly have helped, taken help from anybody who would have come off the street and testified to say a good thing about that young man because I was trying to win his case."

Regarding defendant's proffered witnesses, Prusak concluded:

"These witnesses had bad backgrounds. I wish I can remember in great detail exactly what their backgrounds were, but they were convicted felons, at least one or two of them. And the other ones were, they were inconsistent with each other. And had I seen one witness, anybody, including his brother who was being tried separately by a jury, anybody [who] could have offered anything positive for [defendant] I would have put them on.

But in light of the inconsistencies that they were saying, in light of what he [defendant] told me which was different than what they were telling me, and in light of their backgrounds I thought that I would overtry the case and that I would give ammunition to the State, and I would lose any chance I had of winning the case, which was basically a single-finger I.D. based on reasonable doubt."

Prusak discussed his view of defendant's case "in detail" with defendant. If defendant had wanted certain witnesses to testify, or had wanted to testify on his own behalf, Prusak would have explained his reluctance to do so. However, Prusak would have acceded to defendant's wishes. Also, Prusak could not recall if defendant's mother, Joyce, had requested that he call witnesses. Prusak did remember that they "were talking all the time," and whenever a break occurred during the trial, she would approach and talk to him. Prusak testified that if Joyce had requested in defendant's presence, or if both of them had requested, that Prusak call witnesses, he would have done so. According to Prusak: "They might have asked me to call a witness and I might have told them my reasons *** [why] I didn't think it was wise to call them. But I didn't think the witnesses that they had would benefit [defendant's] case in any way, shape or form." Prusak denied telling defendant or his parents that he had the case "beat," but rather told them that the case was weak. Prusak also denied ever saying that he would not call the witnesses because it would hurt Lowell's case.

In rebuttal, defendant admitted that he did not tell police that he was breaking the victim's car windows during the brawl. Rather, he told police that he was two houses away when the fight began. Also, defendant denied telling Prusak that he used a gun to smash the

-11-

victim's car windows.

Following the evidentiary hearing, the circuit court denied defendant's postconviction petition, and the appellate court affirmed. No. 1–06–0938 (unpublished order under Supreme Court Rule 23). Defendant appeals to this court. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## II. ANALYSIS

The Post-Conviction Hearing Act (Act) (725 ILCS 5/122–1 (West 2000)) provides a remedy to criminal defendants who claim that substantial violations of their federal or state constitutional rights occurred in their original trials. However, a postconviction action is not an appeal from a defendant's underlying judgment. Rather, it is a collateral attack on a prior conviction and sentence. The purpose of the postconviction proceeding is to permit inquiry into constitutional issues involved in the original trial that have not been, and could not have been, adjudicated previously upon direct review. Issues that were raised and decided on direct review are barred by the doctrine of *res judicata*; issues that could have been presented on direct review, but were not, are procedurally forfeited. An evidentiary hearing is warranted only where the allegations of the postconviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *People v. Rissley*, 206 Ill. 2d 403, 411-12 (2003); *People v. Morgan*, 187 Ill. 2d 500, 527-28 (1999).

### A. *Res Judicata*

We observe at the outset that defendant raised a conflict-of-interest claim on direct review of his conviction. Defendant alleged, *inter alia*, that Prusak's trial tactics exhibited a conflict of interest in that Prusak did not attempt to exonerate defendant at Lowell's expense. Defendant recited a list of alleged problems including Prusak's failure to call any witnesses strictly on defendant's behalf. On direct review, the appellate court rejected defendant's conflict-of-interest claim. On review of the circuit court's denial of defendant's postconviction petition, the appellate court correctly rejected the

-12-

State's argument that the doctrine of *res judicata* barred defendant's conflict-of-interest claim. Rules of procedural default and *res judicata* are relaxed where the facts pertaining to a postconviction claim do not appear on the face of the trial record. See *People v. Easley*, 192 Ill. 2d 307, 318 (2000); *People v. Haynes*, 192 Ill. 2d 437, 464-67 (2000); *People v. Evans*, 186 Ill. 2d 83, 94 (1999). We agree with the appellate court that defendant did not–and could not–argue on direct review that he brought Bingham, Plummer, and Woods to Prusak's office, that those witnesses were present at the shooting, and that they did not see defendant hand a gun to Lowell. This information was outside of the trial record and, therefore, could not have been considered on direct review. Therefore, we will address the issue.

## B. Standard of Review

Defendant argues that the circuit court did not make any oral finding of fact and did not enter a written order detailing findings of fact and conclusions of law. Defendant contends that review should be *de novo* because the circuit court made no factual findings to which a reviewing court must defer. The State disagrees, contending that we should employ the manifest error standard of review.

We reject defendant's contention. While a *de novo* standard of review is appropriate in addressing issues that are pure questions of law (*People v. Chapman*, 194 Ill. 2d 186, 217 (2000)), this case does not present such a question. The fact of joint representation, standing alone, does not establish a conflict of interest–evidence is required of specific defects in the representation. At the evidentiary hearing, defendant produced evidence purporting to establish such specific defects. In contrast, the State produced evidence purporting to show the opposite. Thus, the circuit court necessarily had to base its ruling on the specific circumstances of this case and not a broadly applicable rule of law. See *People v. Hall*, 195 Ill. 2d 1, 21 (2000). In light of the above, the decision here will not be disturbed on review unless it is manifestly erroneous. *Rissley*, 206 Ill. 2d at 412; *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002); *People v. Thompkins*, 191 Ill. 2d 438, 468 (2000). "Manifest error" is error which is clearly plain, evident, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

-13-

## C. Conflict of Interest

Defendant claims the evidence established that he was denied his constitutional right to conflict-free representation when Prusak jointly represented defendant and Lowell. The sixth and fourteenth amendments to the United States Constitution guarantee the right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 343-44, 64 L. Ed. 2d 333, 343-44, 100 S. Ct. 1708, 1715-16 (1980); *People v. Mahaffey*, 165 Ill. 2d 445, 456 (1995); *People v. Vriner*, 74 Ill. 2d 329, 337 (1978). A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008); *People v. Morales*, 209 Ill. 2d 340, 345 (2004). Such representation means assistance by an attorney whose loyalty to his or her client is not diluted by conflicting interests or inconsistent obligations. *Mahaffey*, 165 Ill. 2d at 456; *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988).

In determining whether defendant received conflict-free representation, we first resolve whether Prusak labored under a *per se* conflict of interest. This court has identified two categories of conflicts of interest: *per se* and actual. *Hernandez*, 231 Ill. 2d at 142; *Morales*, 209 Ill. 2d at 345. A *per se* conflict of interest exists where certain facts about a defense attorney's status engender, by themselves, a disabling conflict. *Hernandez*, 231 Ill. 2d at 142; *Spreitzer*, 123 Ill. 2d at 14. This court has identified three situations where a *per se* conflict exists: (1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved in the prosecution of defendant. *Hernandez*, 231 Ill. 2d at 143-44; *Morales*, 209 Ill. 2d at 345-46. If a *per se* conflict is found, there is no need to show that the conflict affected the attorney's actual performance. Unless a defendant waives his or her right to conflict-free representation, a *per se* conflict of interest is grounds for automatic reversal. *Hernandez*, 231 Ill. 2d at 143; *Morales*, 209 Ill. 2d at 345; *Spreitzer*, 123 Ill. 2d at 15, 17. Defendant does not argue the existence of a *per se* conflict of interest in this case.

-14-

This court has identified a second category of conflicts of interest which generally, although not exclusively, involve joint or multiple representation of codefendants. *Spreitzer*, 123 Ill. 2d at 17. The joint representation of criminal codefendants is not *per se* violative of the constitutional guarantee of conflict-free representation. *Vriner*, 74 Ill. 2d at 340. Of course, there is always the *possibility* that the interests of codefendants may diverge. *Cuyler*, 446 U.S. at 348, 64 L. Ed. 2d at 346, 100 S. Ct. at 1718; *Vriner*, 74 Ill. 2d at 340. Further, "defense strategy in multiple representation situations often will invite, through hindsight, conceived notions that the representation adversely affected the interests of at least one defendant at some point in the trial process." *Vriner*, 74 Ill. 2d at 342. However, this court has consistently held that a conflict of interest is not inherent in joint-representation situations merely by virtue of such representation. *Vriner*, 74 Ill. 2d at 340 (collecting cases); accord *People v. Orange*, 168 Ill. 2d 138, 156 (1995).

Where, as here, a potential conflict of interest is not brought to the attention of the trial court, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350, 64 L. Ed. 2d at 348, 100 S. Ct. at 1719. Certainly, the defendant is not required to prove prejudice in that the conflict contributed to his or her conviction. *Spreitzer*, 123 Ill. 2d at 18-19. However, to prevail on a claim of ineffective assistance of counsel because of joint representation of criminal codefendants by a single attorney, a defendant must show that an actual conflict of interest manifested at trial. *Orange*, 168 Ill. 2d at 156; *Mahaffey*, 165 Ill. 2d at 456; *Spreitzer*, 123 Ill. 2d at 18. "What this means is that the defendant must point to some specific defect in his counsel's strategy tactics, or decision making attributable to the conflict." *Spreitzer*, 123 Ill. 2d at 18; see *Mahaffey*, 165 Ill. 2d at 456.

In the present case, we conclude that defendant failed to establish an actual conflict of interest in the joint representation of himself and Lowell that adversely affected Prusak's performance at trial. In defendant's postconviction petition, the only alleged specific defect in Prusak's representation that defendant attributes to the claimed conflict is that Prusak failed to call defendant's proffered witnesses, who would have testified that only Lowell was involved in the

shooting.[6] Indeed, at oral argument, defendant argued that an "actual" conflict manifested solely on defendant's proffer of his witnesses.

First, an actual conflict of interest never manifested. A conflict of interest was not inherent in the joint representation of defendant and Lowell. At most, defendant's proffered witnesses merely raised the *possibility* that the interests of defendant and Lowell may diverge. At defendant's trial, defendant and Lowell each denied his guilt and did not implicate the other. Prusak vigorously cross-examined the State's witnesses, impeached their credibility, and argued that the State failed to meet its burden of proof beyond a reasonable doubt. This strategy alone does not reveal an actual conflict. See *Vriner*, 74 Ill. 2d at 341. The mere availability of a strategy that would have helped one criminal codefendant at the expense of another does not create hostility between their interests. Defendant merely attempts to create an actual conflict of interest through conjecture and hindsight as to what strategy might have been pursued. This court will not overturn a conviction based on possible or hypothetical conflicts. See *Mahaffey*, 165 Ill. 2d at 456-57; *Griffin*, 109 Ill. 2d at 306.

Second, the record fails to establish any specific adverse effect in Prusak's performance attributable to the alleged conflict. The circuit court held an evidentiary hearing, in which the court heard defendant and his witnesses testify. According to their postconviction hearing testimony, defendant's witnesses would have testified at defendant's trial that defendant did not hand a gun to Lowell. Further, according to defendant's witnesses, Prusak did not call them to testify at defendant's trial because they would have identified Prusak's other client, Lowell, as the shooter. At the evidentiary hearing, the circuit court also heard Prusak testify. According to Prusak, his decision not

---

[6]In his reply brief and at oral argument, defendant also speculates that Prusak's alleged conflict of interest manifested not only at trial but also as to possible pretrial plea negotiations. Defendant argues that he was entitled to an attorney who could make a decision to use or not use the testimony of his proffered witnesses or to engage in plea negotiations unfettered by the effect of those decisions on Lowell's case. However, because defendant did not include this specific alleged defect in his postconviction petition, he has procedurally forfeited this contention. See *People v. Davis*, 156 Ill. 2d 149, 158 (1993).

to call defendant's proffered witnesses was not attributable to any alleged conflict of interest, but rather because, in his professional judgment, they were weak witnesses, who offered inconsistent testimony and who were not credible. For example, Anderson testified that defendant did not hand a gun to Lowell because defendant was smashing the victim's car windows. Prusak testified that defendant likewise told him that defendant smashed the victim's car windows, however, *with a gun*.

As earlier discussed, the testimony at the evidentiary hearing was contradictory, setting up a question of fact as to whether Prusak's decision not to call defendant's proffered witnesses was attributable to the alleged conflict of interest. For example, Prusak denied telling defendant, his parents, or his witnesses that the case was already "beat" or that he would not call the witnesses because to do so would hurt Lowell's case. Defendant denied telling Prusak that he used a gun to smash the victim's car windows. The determination of this question rested substantially on the credibility of the witnesses at the evidentiary hearing. "Credibility is not, of itself, a question for a court of review ***." *Griffin*, 109 Ill. 2d at 307. Rather, in a postconviction evidentiary hearing, the circuit court, which saw and heard the witnesses, is in a better position than a reviewing court to engage in fact-finding and credibility determinations. *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998) (and cases cited therein); *People v. Rose*, 48 Ill. 2d 300, 303 (1971); *People v. Burton*, 46 Ill. 2d 135, 141 (1970). In the present case, the circuit court evidently found Prusak's testimony more credible. See *People v. Logue*, 45 Ill. 2d 170, 174-75 (1970); *People v. Wease*, 44 Ill. 2d 453, 457 (1970).

We observe that during his testimony, Prusak commented: "If they [defendant and Lowell] had the same trier of fact it would have been a conflict." Defendant points to this comment and a few others in contending that Prusak operated under a legal misunderstanding of the concept of conflict-free representation. Defendant posits that "severance does not automatically cure potential conflicts."

We cannot accept defendant's contention. The clear weight of Prusak's testimony demonstrates his belief that the evidence against defendant was weak, and that defendant's proffered witnesses were inconsistent and not credible. Prusak requested a bench trial for defendant for those reasons and not to cure a perceived conflict of

interest. The circuit court's acceptance of this conclusion was not manifestly erroneous.[7]

Indeed, the circuit court's credibility determination is particularly justified based on the contradictions among defendant and his witnesses. See *People v. Downen*, 45 Ill. 2d 197, 201 (1970) (affirming circuit court's denial of postconviction petition following evidentiary hearing; noting contradictions in testimony of defendant's witnesses); *Wease*, 44 Ill. 2d at 457 (same). Bingham's testimony did not remove defendant from the fight. However, Plummer testified, consistent with Woods' affidavit, that defendant was not involved in the fight. Further, Anderson testified that defendant was not involved in the fight because he was destroying the victim's car; however, Anderson admitted on cross-examination that he could not see defendant from where Anderson stood. Defendant testified that he was smashing the victim's car windows, but he admitted that he did not tell this to police. We find no basis for upsetting the circuit court's evaluation of the credibility of the witnesses. See *Griffin*, 109 Ill. 2d at 307 (concluding that appellate court erroneously substituted its view of witness credibility for that of circuit court; finding circuit court's denial of postconviction petition following evidentiary hearing not manifestly erroneous); *Logue*, 45 Ill. 2d at 174-75; *Wease*, 44 Ill. 2d at 457.

We lastly note that defendant cites cases in which a conflict was found to exist. See, *e.g.*, *People v. White*, 362 Ill. App. 3d 1056 (2005). Those cases are inapposite, as Prusak's testimony at the evidentiary hearing supports a finding that no such conflict existed in the present case. Whether a conflict of interest exists must be evaluated on the specific facts of each case. See *People v. Johnson*, 227 Ill. App. 3d 800, 811 (1992).

In sum, Prusak's joint representation of defendant and Lowell did not result in a *per se* conflict of interest. Further, defendant failed to

---

[7]In any event, while not an automatic cure, the trial of codefendants before separate triers of fact " 'significantly reduce[s] the potential for a divergence in their interests.' " *Burger v. Kemp*, 483 U.S. 776, 784, 97 L. Ed. 2d 638, 651, 107 S. Ct. 3114, 3120 (1987), quoting *Cuyler*, 446 U.S. at 347, 64 L. Ed. 2d at 346, 100 S. Ct. at 1718.

demonstrate how an actual conflict of interest adversely affected Prusak's performance at defendant's trial. The circuit court found as more credible Prusak's testimony that his decision not to call defendant's proffered witnesses was not attributable to any alleged conflict of interest, but rather was based on trial strategy and tactics, and Prusak's professional judgment. After reviewing the entire record, we cannot say that the circuit court's finding that defendant failed to establish a substantial violation of his constitutional right to conflict-free representation was manifestly erroneous. Therefore, we uphold the circuit court's order denying defendant's postconviction petition.

### III. CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed*.


CHIEF JUSTICE FITZGERALD took no part in the consideration or decision of this case.