2025 IL App (1st) 231045-U

FIRST DISTRICT,
SIXTH DIVISION
March 21, 2025

No. 1-23-1045

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 07 CR 1090403 |
| | ) | |
| DERICK LEWIS, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant, | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1      *Held*: The trial court's denial of Lewis' postconviction petition after an evidentiary hearing was not manifestly erroneous because the evidence did not establish his trial counsel was ineffective for not calling a codefendant as a witness at trial.

¶ 2      Defendant Derick Lewis appeals from the trial court's denial of postconviction relief following a third stage evidentiary hearing. Lewis argues the trial court's denial of his postconviction petition was manifestly erroneous because he established by a preponderance of

the evidence his trial counsel was ineffective for failing to call codefendant, Keshia Burgman[1], as a witness at trial. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4        Following a jury trial, Lewis was convicted of one count of robbery and three counts of aggravated criminal sexual assault and sentenced to a total of 46 years' imprisonment. On direct appeal, Lewis challenged the trial court's response to a jury question, and we affirmed. *People v. Lewis*, 2011 IL App (1st) 092257-U, ¶ 1. Lewis subsequently filed a petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)), alleging, *inter alia*, ineffective assistance of trial counsel, which the trial court summarily dismissed at the first stage. *People v. Lewis*, 2015 IL App (1st) 130340-U, ¶ 2. We reversed and remanded for appointment of counsel and further proceedings. *Id.* Following a third stage evidentiary hearing, the trial court denied Lewis' postconviction petition in a written order.

¶ 5                                    A. Jury Trial

¶ 6        The following facts, taken from Lewis' direct appeal and initial postconviction appeal, are discussed only to the extent necessary to resolve the issues on appeal. See *Lewis*, 2011 IL App (1st) 092257-U, ¶¶ 2-15; *Lewis*, 2015 IL App (1st) 130340-U, ¶¶ 4-12.

¶ 7        T.W., the victim, testified she was 19 years old on April 16, 2007. Around 4:00 a.m., T.W. was leaving her boyfriend's house and accepted a ride from Lewis rather than wait for the bus. Calvin Kelly and another man were in the back seat. T.W. got out of the car after several minutes because the men's comments were making her "uncomfortable."

¶ 8        As T.W. waited at a bus stop, Lewis drove by, and she got into his vehicle again, which at that point contained only Lewis and Kelly. She and Lewis sat in the back seat while Kelly drove.

---

[1] Keshia Burgman is sometimes spelled "Keisha Bergman" in the record on appeal.

They took T.W. to her home as she asked, but she did not recall why she did not get out of the car. They continued driving "out west." Lewis and T.W. got into an argument, he pushed her in the face several times, and she told him to stop and pushed him back. T.W. accidentally scratched him. They arrived at Kelly's apartment, where she willingly followed them inside.

¶ 9 Two women, Keshia Burgman and Latoya Carlton, were sleeping in the apartment. According to both T.W. and Lewis, the women woke up and spoke to Lewis in a bedroom. Burgman and Carlton then attacked T.W., punching her in the head and face. T.W. testified Lewis broke up the altercation and led her to a bedroom to wipe blood from her clothing and face. Lewis brought her to the bathroom and told her to take off her clothes or he would have the women attack her again.

¶ 10 T.W. testified Lewis then sexually assaulted her in the bathroom. Lewis put his penis in her vagina, mouth, and anus. T.W. told Lewis to stop because he was hurting her. She denied accepting money and agreeing to have sex with Lewis and/or Kelly. Upon returning to the living room, Lewis demanded that T.W. give him money. She gave Lewis $30 from her purse, which she had left on a table. She noticed her phone and bus card were missing from her purse. The women and Kelly denied seeing the items. Lewis and Kelly left the apartment.

¶ 11 T.W. testified she was crying while she told the women what happened. The women forced her to go to McDonald's with them and their neighbor, Walter Clark, to buy breakfast. T.W. stayed in the car because she was afraid and did not have her phone or bus card. The women told her not to leave or call the police. The group returned to the apartment after McDonald's. After she told Clark she had been assaulted, he took her to a currency exchange. The police were called, and she was taken to a hospital, where she identified Lewis in a police photo array. Lewis, Kelly, Burgman, and Carlton were arrested. Later that day, T.W. identified Lewis in a physical lineup.

¶ 12 Clark testified generally consistently with T.W.'s account. After they got back from

McDonald's, Burgman gave Clark $20 to drive T.W. to a nearby currency exchange. On the drive, T.W. cried and told him she had been raped. At the currency exchange, Clark told a teller that T.W. had been raped and needed help. A clerk at the currency exchange offered testimony that corroborated Clark's account.

¶ 13    Chicago police officer Debra Gills testified that she responded to the call, drove to the currency exchange and went to Kelly's apartment after interviewing T.W. Another officer recovered T.W.'s cell phone from under a mattress in the apartment. Kelly, Burgman and Carlton were arrested for robbery.

¶ 14    Kelly and Carlton both testified for the State. Kelly testified he, Lewis, and Jason Bagget were drinking and driving around in Lewis' truck. They saw T.W. walking along the street and called out to her, but she would not "hang out" with them because there were too many men in the truck. Kelly and Lewis dropped Bagget at home and later drove past T.W. again. Lewis offered to pay T.W. for sex and she agreed. When they got to Kelly's house, Lewis spoke with Burgman and Carlton, and the two started hitting T.W. Before T.W. went into the bathroom, Kelly heard Lewis tell her, "[Y]ou never know who *** you messing with." T.W. said she "didn't know what she did, but she was sorry for it." Kelly heard "bumping, moaning, things like that" coming from the bathroom and heard Lewis ask her for money when they returned to the living room. Kelly denied taking anything from T.W.'s purse but stated he kept a bus card and cell phone that Burgman or Carlton retrieved from the floor and placed on the counter.

¶ 15    Chicago Police Detective Arthur Taraszkiewicz testified that Kelly told him Carlton and Burgman attacked T.W. in the apartment and he took T.W.'s cell phone away from Carlton so she could not call the police. Although Kelly first told the detective the bus card belonged to him, he later said he retrieved the card from the floor after the women attacked T.W. Detective Taraszkiewicz and Assistant State's Attorney (ASA) Michael O'Malley testified that in previous

interviews Kelly had not mentioned anything about an agreement for sexual acts for money. Kelly also stated that Lewis had repeatedly touched T.W.'s head in the truck, despite her protestations, and that Lewis had threatened T.W. to remove her clothes or he would set Burgman and Carlton "back on" her.

¶ 16     At the time of Lewis' trial, Carlton was on probation for robbery in the instant case. She admitted that when Lewis arrived at the apartment, he asked her and Burgman to "fight" T.W. because she had scratched his eye, and they attacked T.W. Lewis ordered T.W. to go into the bathroom with him and to do what he said. While they were in the bathroom, T.W. stated, "I thought you were going to take me home," and "stop, stop, I've never had it like that." After Lewis and T.W. returned to the living room, Lewis demanded money from T.W., which she took out of her purse. Lewis told Carlton that he knew where she lived and that he would do the same thing to her if she told anyone about what had happened. After Lewis and Kelly left the apartment, Carlton and Burgman brought T.W. to Clark, and they all went out for breakfast. Carlton later gave Clark $20 to buy T.W. a bus ticket. She said T.W. was looking for the phone before they left the apartment. When asked if she saw a cell phone, Carlton stated she saw it "that morning when [Kelly] put it under the bed." On cross-examination, Carlton said she pled guilty to robbery in this case because she "wanted to get out of jail because I was sitting in there for six months for something that I didn't do."

¶ 17     In the defense case, Lewis testified that T.W. accepted the ride after he told her he and Kelly wanted to have sex with her. She got out of the car when they ultimately disagreed on a price. When she got in the car a second time, Lewis gave her $60 and they discussed "partying," a term understood to include sex. At the apartment, Lewis had Carlton and Burgman attack T.W., and he helped her into the bathroom to clean up. Lewis testified that T.W. then performed the sex acts in the bathroom that they had agreed upon earlier. When they came out, she returned $30 to

Lewis because she did not have sex with Kelly.

¶ 18    In its closing argument, the State argued T.W. was a young girl who had made a naïve mistake of getting into Lewis' truck. Lewis' trial counsel then argued that T.W. was in a location frequented by prostitutes late at night and had agreed to have consensual sex with Lewis for money.

¶ 19    The jury found Lewis guilty of robbery and three counts of aggravated criminal sexual assault, based on various sexual acts. The trial court sentenced Lewis to 10 years' imprisonment for robbery and to 12 years' imprisonment for each sexual assault conviction, all to be served consecutively, for a total sentence of 46 years in prison.

¶ 20                                B. Direct Appeal

¶ 21    On direct appeal, Lewis challenged the trial court's response to a jury question and claimed the improper response warranted a new trial. *Lewis*, 2011 IL App (1st) 092257-U, ¶ 17. We found the trial court did not err in its response and affirmed his conviction. *Id.* ¶¶ 40, 44.

¶ 22                            C. Postconviction Petition

¶ 23    Lewis subsequently filed a *pro se* postconviction petition arguing, *inter alia*, trial counsel was ineffective for failing to call Bagget and Burgman as witnesses. Lewis attached an affidavit from Burgman to his petition, in which Burgman averred she would have testified the police had threatened her and that Lewis never threatened Carlton. The petition noted Lewis could not reach Bagget for an affidavit because Lewis had divorced his wife, who was Bagget's cousin, and his incarceration prevented him from locating Bagget.

¶ 24    On December 5, 2012, the trial court summarily dismissed the petition at the first stage in a written order. The trial court found counsel's decision not to call Burgman was a matter of trial strategy, and the court could not consider Lewis' claim regarding Baggett without an affidavit.

¶ 25    On appeal, Lewis argued his petition set forth an arguably meritorious claim that trial counsel was ineffective for failing to call two witnesses, Burgman and Baggett, whose testimony,

he alleges, would have contradicted the testimony of two State witnesses. *Lewis*, 2015 IL App (1st) 130340-U, ¶ 2. We found under the "liberal first-stage standard," Lewis' petition set forth an "arguable claim that trial counsel's failure to call a witness who could corroborate defendant's version of the night's events was objectively unreasonable." *Id*. ¶ 21. We noted matters of trial strategy are "generally more appropriate for consideration on the second stage proceedings." *Id*. ¶ 20. We instructed that "the factual question of where [Burgman] was located, and her credibility are determinations that should be made at the evidentiary stage and not at the dismissal stage." *Id*. ¶ 22. We remanded the petition for second-stage proceedings. *Id*. ¶ 23.

¶ 26                                D. Proceedings on Remand

¶ 27        On September 24, 2015, the circuit court appointed the Office of the Public Defender to represent Lewis. On April 18, 2017, Assistant Public Defender (APD) Greg Koster filed an amended petition and a Rule 651(c) certificate. The amended petition only included the claim of ineffective assistance of counsel for failing to call Burgman and Baggett. The amended petition included an affidavit from Keshia Burgman dated December 27, 2016, an affidavit from Jason Baggett dated March 1, 2017, and an affidavit from Lewis dated March 21, 2017. On October 25, 2017, the People informed the court that the parties agreed to a third-stage hearing. The People filed an answer to Lewis' amended petition and a motion for discovery.

¶ 28        On February 28, 2019, ASA Linda Walls informed the court that Lewis' trial counsel, APD Crystal Carbellos, had passed away. On July 13, 2021, APD Chris Nolan informed the court that he was having a hard time finding one of the witnesses who provided an affidavit. On September 14, 2021, private counsel Eric Bisby appeared for Lewis.

¶ 29        The circuit court held a third stage evidentiary hearing on January 25, 2023. During opening statement, defense counsel explained it would proceed on the claim of ineffective assistance for failing to call Burgman, but did not mention Bagget.

¶ 30    Burgman testified she was Lewis' niece and remembered a night in 2007 when Lewis brought a woman to her apartment. That night, Burgman was with Carlton getting her hair done when Lewis came to the apartment with Kelly and T.W. T.W. did not appear to be worried or scared and did not say she wanted to go home. Burgman noticed Lewis had a scratch over his eye. According to Lewis, T.W. scratched him after he told her to get out of his car and "she didn't want to leave." After learning this, Burgman hit T.W. "five or six times." Carlton also hit T.W. Burgman estimated the altercation lasted seven to ten minutes. Burgman testified Lewis never told anyone to hit T.W. However, in her written statement before trial, she stated that Lewis asked her to beat T.W.

¶ 31    Burgman testified that T.W. did not ask for help or try to leave the apartment after being beaten. T.W.'s lip was split and her eyes were swollen. Burgman gave T.W. a towel to clean herself up, and T.W. and Lewis went to Burgman's bedroom. Lewis did not "drag" or otherwise force T.W. into the room. Burgman could not hear any conversation between the two while they were in the bedroom. At some point, they left the bedroom and went into the bathroom and closed the door. Burgman, who was approximately 15 to 20 feet away from the bathroom, heard "sexual noises" coming from the bathroom. She never heard T.W. yell "stop" or anything else. Burgman acknowledged she did not know whether the sex between Lewis and T.W. was consensual.

¶ 32    T.W. and Lewis left the bathroom after twenty to thirty minutes. T.W. sat down on the couch but did not immediately ask to leave or for help. At some point, T.W. indicated she wanted to leave but could not find her bus card. Burgman tried to help but eventually paid her neighbor to take T.W. to the currency exchange.

¶ 33    Burgman was arrested and spoke to the police and an ASA. Burgman signed a handwritten statement after talking to the ASA. In Burgman's statement, she said Lewis told her that T.W. knocked off his glasses and beat him on the chest, and Burgman should "whoop" T.W. for him.

Burgman did not recall saying this, and further testified, "It's a lot I don't remember," including not recalling going to breakfast with T.W. after Lewis left the apartment. Burgman eventually pled guilty to robbery and was sentenced to probation. Burgman claimed she would have testified at Lewis' trial if she had been asked, but her family told her she was not allowed.

¶ 34    Burgman did not recall giving two affidavits, dated December 27, 2016, and January 30, 2018, but identified her signature on the documents. In the first affidavit, Burgman stated she "whooped" T.W. for Lewis. Burgman did not say in her affidavit Lewis raped T.W. or threatened Carlton. Burgman did not remember speaking with an investigator from the State's Attorney's Office in 2017 and did not remember telling the investigator she drafted an affidavit and sent it to Lewis in jail for him to type up and review. Burgman did not recall telling the investigator she did not know who was moaning in the bathroom and T.W. came out of the bathroom crying. The parties stipulated that, if called to testify, the investigator would testify Burgman made these statements.

¶ 35    In a written order entered on May 30, 2023, the circuit court found Lewis failed to meet the standard for ineffective assistance because trial counsel's decision not to call Burgman as a witness was a matter of trial strategy. The court found even if the jury had heard the testimony of Burgman, there was no reasonable probability that the outcome of the trial would have been different. Finally, the court did not find Burgman to be credible based on her bias as Lewis' niece, her demeanor, her hesitation in answering questions, her lack of memory, and her overall manner while testifying. The circuit court denied Lewis' postconviction petition.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, Lewis argues he established a substantial violation of his right to effective assistance of counsel at the evidentiary hearing where Burgman would have corroborated Lewis' claim that the sex with T.W. was consensual. The State maintains the evidence does not support

Lewis' claim and, alternatively, there is no reasonable probability that Burgman's testimony would have changed the outcome of the trial. We agree with the State.

¶ 38 The Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West 2020)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2020); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Id.* at 380. "A proceeding brought under the [Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). This appeal comes to us following a third-stage evidentiary hearing under the Act.

¶ 39 At the evidentiary hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. At the evidentiary hearing, the defendant bears the burden of proof to show a denial of a constitutional right by the preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. Since the trial court makes factual and credibility determinations, the court's decision will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. " 'Manifest error' is error which is clearly plain, evident, and indisputable." *People v. Taylor*, 237 Ill. 2d 356, 373 (2010). "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98. "The burden of convincing a reviewing court that a trial court's decision was manifestly erroneous is a heavy one." *People v. Jones*, 2012 IL App (1st) 093180, ¶ 49.

¶ 40 To determine whether a defendant was denied his right to effective assistance of counsel,

we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. In assessing such a claim, the court must give deference to counsel's conduct within the context of trial and without the benefit of hindsight. *Id.* at 689. As such, "a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Haynes*, 192 Ill. 2d 437, 472-73 (2000). The decision of which witnesses to call is a matter of trial strategy. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38. Strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are "virtually unchallengeable." *People v. Towns*, 182 Ill. 2d 491, 514 (1998).

¶ 41    In addition to showing counsel's performance was deficient, a defendant must also establish that he or she was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 42    Lewis argues his trial counsel rendered deficient performance because Burgman's testimony would have corroborated his account and rebutted the testimony of T.W. and Carlton. As we noted before remand, it was the function of the trial court at the evidentiary hearing to determine Burgman's credibility, decide the weight to be given her potential testimony, and resolve any conflicts in the evidence. *Lewis*, 2015 IL App (1st) 130340-U, ¶ 22; *Domagala*, 2013 IL 113688, ¶ 34. The trial court explicitly found Burgman not credible based on her inherent bias as Lewis' niece, her demeanor while testifying, her hesitation in answering questions, and her lack of memory. There is no basis in the record to disturb these findings and, as such, the trial court's determination was not manifestly erroneous.

¶ 43        Burgman testified at the evidentiary hearing "[i]t's a lot I don't remember," and she did not recall many of the things that were in her statements to an ASA and an investigator, or her affidavits. Further, Burgman's testimony that Lewis never told anyone to hit T.W. directly contradicts Lewis' own admission at trial that he had Carlton and Burgman attack T.W. in the apartment. While Lewis asserts on appeal Burgman's testimony was credible because she was "close to the bathroom during the sex acts in question," the trial court correctly noted the bathroom door was closed. Burgman was not in the bathroom and could not tell whether the sex between T.W. and Lewis was consensual. The "noises" Burgman heard and "associated with sex" were also testified to by Kelly, who heard "bumping, moaning, things like that." Burgman admitted to the investigator in 2017 she did not know who was moaning in the bathroom and T.W. came out of the bathroom crying. That Burgman did not hear T.W. tell Lewis to stop or hear Lewis threaten T.W. and Carlton is of no moment, since these statements and threats were not directed at Burgman and could well have occurred outside her earshot. Accordingly, we believe there was ample reason not to call Burgman as a witness at Lewis' trial.

¶ 44        The cases Lewis cites in support of his ineffectiveness argument are all factually distinguishable. In *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 40, defense counsel failed to interview a potential alibi witness or even investigate the defendant's alibi, and "[t]he record suggest[ed] no strategic reason" for counsel's failure to do so. In *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 61, the defendant was entitled to a third-stage evidentiary hearing based on "defense counsel's failure to investigate fully the possible testimony of exculpatory witnesses." Here, by contrast, defense counsel was undoubtedly fully aware of Burgman, as she was a codefendant charged with robbery along with Lewis.

¶ 45        The cases involving the failure to call witnesses at trial are also inapposite. In both *People v. Tate*, 305 Ill. App. 3d 607 (1999), and *People v. King*, 316 Ill. App. 3d 901 (2000), defense

counsel focused on attacking the credibility of the State's witnesses instead of presenting allegedly exculpatory evidence. For instance, in *Tate*, we found that the record did not reflect whether trial counsel's decision was a "professionally reasonable tactical decision" or the result of incompetence, and further evidence was therefore required. *Tate*, 305 Ill. App. 3d at 612. In *King*, we remanded for a new trial where the defense chose to attack only one of the State's three witnesses and provided no evidence at an evidentiary hearing demonstrating a reasonable explanation for failing to call an alibi witness. *King*, 316 Ill. App. 3d at 916. In this case, however, defense counsel had a plethora of possible reasonable explanations for not calling Burgman, namely, her inherent bias, demeanor, and manner of testifying, as well as the lack of usefulness in her testimony. Therefore, we find Lewis failed to establish he suffered a substantial deprivation of his constitutional right to effective assistance of counsel and affirm the trial court's third-stage denial of the Lewis' postconviction claim arguing that his trial counsel was ineffective for failing to call Burgman as a witness.

¶ 46                                    III. CONCLUSION

¶ 47        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 48        Affirmed.